**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**HELOIS ELAINE MORRIS,**

    **Plaintiff,**    **CIVIL ACTION NO. 13-cv-14089**

 **vs.**

            **DISTRICT JUDGE LAWRENCE P. ZATKOFF**

**COMMISSIONER OF**    **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

    **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Helois Morris seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to Social Security benefits for her mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 12) and Defendant's Motion for Summary Judgment (docket no. 13). Plaintiff filed a response to Defendant's Motion. (Docket no. 14.) The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 2.) The Court has reviewed the pleadings, dispenses with a hearing pursuant to E.D. Mich. L.R. 7.1(f)(2), and issues this Report and Recommendation.

**I. RECOMMENDATION:**

The Court recommends that Plaintiff's Motion for Summary Judgment (docket no. 12) be DENIED and that Defendant's Motion for Summary Judgment (docket no. 13) be GRANTED.

**II. PROCEDURAL HISTORY:**

Plaintiff filed an application for Disability Insurance Benefits with a protective filing date of November 8, 2010, alleging that she had been disabled since May 28, 2009, due to the following severe impairments: major depressive disorder, recurrent; generalized anxiety disorder; and panic disorder without agoraphobia. (*See* TR 32.) The Social Security Administration denied benefits. (TR 29.) Plaintiff requested a *de novo* hearing, which was held on January 30, 2012, before Administrative Law Judge (ALJ) Patricia S. McKay, who subsequently found that Plaintiff was not entitled to benefits because she was capable of performing a significant number of jobs in the national economy. (TR 37.) The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced this action for judicial review. The parties then filed their instant Motions.

### III. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

#### A. Plaintiff's Testimony

Plaintiff was 48 years old at the time of the administrative hearing and 46 years old at the time of alleged onset. (Docket no. 12-2 at 1; TR 57.) At the time of the hearing, Plaintiff was married and lived at home with her husband. (TR 57.) She testified that she had completed some college but had not received a degree. (TR 58.) Plaintiff had also received on-the-job training to become a dialysis technician. (TR 59.) Plaintiff testified that she began working as a dialysis technician in 1986. (*Id.*) She worked for multiple dialysis clinics until approximately May 2009. (TR 61-62.) From May 2009 until the end of 2009, Plaintiff was on short-term disability for mental-health reasons, specifically depression. (TR 64-65.) In 2010, Plaintiff worked as a dialysis technician for about a month, but she was fired because of conflicts with her sister-in-law, who was her supervisor. (TR 62.) Plaintiff testified that she was receiving unemployment benefits, which were scheduled to end in March 2012. (TR 65.) Plaintiff also worked for short periods of time as

2

a dialysis instructor, teaching a five-week course and substituting for other instructors. (TR 66-67.)

Plaintiff testified that she was taking Lexapro and Klonopin to treat her clinical depression and anxiety. (TR 70.) The Lexapro caused Plaintiff to have difficulty sleeping. (*Id.*) To address this problem, she was prescribed Ambien. (*Id.*) However, the Ambien was no longer effective because her Lexapro dosage had been increased. (*Id.*) As a result, Plaintiff would take three Benedryls just to fall asleep, and even then she could only sleep for four hours at most. (*Id.*)

In addition to the insomnia, Plaintiff also testified that the medication made it difficult for her to absorb and retain information. (TR 80.) Plaintiff stated that she felt like a zombie or that she was in a constant "fog" because of the medications. (TR 80-81.) Finally, Plaintiff stated that another side effect of the medication had led to difficulties controlling her anger, which caused her to frequently lash out at others without provocation. (TR 81.)

When asked to describe a normal day, Plaintiff stated that she typically got out of bed around 11:30 a.m. (TR 71.) She then brushed her teeth, combed her hair, changed into sweats, and made the bed. (*Id.*) Plaintiff went on to say that she spent most of her days in the bedroom, on the bed, on top of the covers, where she watched television. (TR 71, 81-82.) Two or three times each day, Plaintiff had crying spells lasting about fifteen minutes. (TR 81.) She rarely ate anything during the day until her husband came home from work and cooked dinner. (TR 71.) Plaintiff also testified that she obsessively shopped online while knowing that she could not afford to purchase anything. (TR 72.)

Plaintiff testified that she rarely left the house and preferred not to visit with friends or relatives. (TR 73, 83.) She also stated that she did not engage in any hobbies or activities. (TR 74.) She did, however, watch her six-year-old granddaughter two weekends each month. (*Id.*) During these visits, Plaintiff stayed in bed while her granddaughter sat on the bed and watched children's

television programs. (*Id.*)

In addition to Plaintiff's depression and anxiety, she also testified that she was asthmatic, had signs of irritable bowel syndrome (IBS), was incontinent, and had hallucinations of her deceased father. (TR 75-76.) The asthma and IBS have been managed using an inhaler and over-the-counter medications. (TR 75.) Plaintiff stated that she wore pads for the incontinence, but this led to a fear of potential body odor. (TR 76.) Because of this perceived body odor, Plaintiff felt uncomfortable in public situations. (*Id.*) Plaintiff had not disclosed the hallucinations before her testimony for fear of people thinking that she was crazy and having her institutionalized. (TR 78.)

The ALJ explained to Plaintiff that, "disability's not just about whether you can do your last job, but whether there's any other jobs that exist that you could perform." (TR 78.) The ALJ then asked Plaintiff why she did not feel like there was any work she could do. (*Id.*) Plaintiff responded that she felt like her memory was not good enough to remember tasks and instructions, so she would have to continually ask what she should be doing. (TR 78-79.) She also stated that the fear of possibly having body odor has prevented her from feeling like there was work that she could do. (*Id.*)

The ALJ also asked Plaintiff about her unemployment benefits, specifically the type of work she was looking for to continue receiving the benefits. (TR 79.) Plaintiff told the ALJ that she had been applying for positions in her previous field of work as a dialysis technician. (*Id.*) She added, however, that she was only searching for a job because she was told it was required to continue receiving benefits. (*Id.*)

### B. Medical Record

Plaintiff (docket no. 12-2 at 1-6), Defendant (docket no. 13 at 11-13), and the ALJ (TR 31-37) each set out a factual background related to Plaintiff's medical record. The Court finds that

there are no significant inconsistencies between the three accounts; thus, the Court will incorporate them by reference herein. The undersigned has, however, conducted an independent review of Plaintiff's medical record and will include comments and citations as necessary throughout this Report and Recommendation.

### C.     The Vocational Expert

The ALJ first asked the VE to consider a hypothetical person of Plaintiff's age, education, and vocational experience, who is able to work with the following limitations:

> This person needs to be limited to work that's simple, routine, repetitive; work where she retains control over the pace of the work as opposed to, like, a production-line work environment; and the work needs to be limited to occasional contact with coworkers or the general public, where she's not closely supervised.

(TR 86.) When asked, the VE testified that such an individual could not perform Plaintiff's past relevant work. (TR 86-87, 90-91.) The VE then testified that with these limitations, an individual could perform work as a cleaner and polisher, an office helper, or an inspector and that 19,600 of these jobs existed in Southeast Michigan's tri-county area. (TR 87.)

The ALJ then asked the VE to assume that this same individual was limited to jobs consisting of one- or two-step tasks. (TR 87-88.) The ALJ asked the VE if such a person could work in the identified positions. (*Id.*) The VE testified that such an individual could perform all three jobs. (TR 88.)

The ALJ also asked the VE to assume the that same individual was diagnosed with asthma and needed to avoid continuous exposure to pulmonary irritants. (TR 88.) The VE testified that such a limitation would not have any effect on the job as an office helper or inspector but may reduce the number of cleaner/polisher positions by half due to the use of potentially irritating solvents. (*Id.*)

The ALJ then asked the VE to assume that this same hypothetical individual required one or two reminders each day. (TR 88-89.) The VE testified that during the course of a business day, needing one to two reminders would not negatively impact a person's ability to maintain the identified jobs. (TR 89.) However, if reminders were needed more frequently, the individual would require a sheltered-employment-type work environment. (*Id.*)

Additionally, the ALJ asked the VE if two to three crying spells per day, each lasting approximately 15 minutes, would affect these jobs. (*Id.*) The VE responded that one to two unscheduled breaks for 10 or 15 minutes would not significantly affect the individual's ability to perform the identified jobs, but any additional time would become work-preclusive. (TR 89-90.)

Finally, the ALJ asked the VE how the potential jobs would be affected if the hypothetical claimant were off task 20% of the day. (TR 90.) The VE believed being off task 20% of the day would be the most a person could be off task and still maintain employment. (*Id.*) The VE's opinion was that anything beyond 20% would be work-preclusive. (*Id.*)

## IV.     ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2015; that she had not engaged in substantial gainful activity since May 28, 2009, the date of her alleged onset; and that she had the following severe impairments: major depressive disorder, recurrent; generalized anxiety disorder; and panic disorder without agoraphobia. (TR 31.) The ALJ further found that her impairments did not meet or medically equal the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (TR 32.) The ALJ determined that Plaintiff had the residual functional capacity to perform a full range of work with the following additional limitations:

> [W]ork that is simple, routine, and repetitive where she is able to control the pace of

> the work (i.e., avoid production line work environment); that requires only occasional contact with coworkers and the general public; and that is not closely supervised.

(TR 33.) The ALJ then determined, in reliance on the VE's testimony, that Plaintiff was capable of performing a significant number of jobs in the national economy. (TR 37.) Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time from May 28, 2009, through the date of the ALJ's decision. (TR 38.)

## V. LAW AND ANALYSIS

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial

evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.  Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) Plaintiff was not presently engaged in substantial gainful employment; and

(2) Plaintiff suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.      Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)).  Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing.  42 U.S.C. § 405(g).  Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration."  *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).  Plaintiff argues that this matter should be reversed or remanded because the ALJ failed to: (1) follow the treating physician rule; (2) properly evaluate the Plaintiff's credibility; and (3) support the residual functional capacity finding with substantial evidence.  (Docket no. 12-2 at 7-16.)

### 1.      The ALJ's Assessment of the Medical Opinions of Record

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record.   20 C.F.R. § 404.1527(c)(2).  It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician.  *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008).  Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight." *Id.* (citing *Bass v. McMahon*,

499 F.3d 506, 511 (6th Cir. 2007)). The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant. 20 C.F.R. § 404.1527(c)(1). The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist. 20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)). If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Additionally, the Sixth Circuit has upheld the decision of an ALJ which gave less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) where the ALJ provided "good reason" for the decision. *See Infantado v.*

*Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir.2008). There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)).

### a. Dr. Piccinini

On August 21, 2011, Dr. Robert Piccinini, Plaintiff's treating psychiatrist, completed an evauation form indicating that Plaintiff was capable of low-stress work and was mildly to markedly limited in the area of understanding and memory and the area of sustained concentration and persistence. (TR 311-18.) Dr. Piccinini also indicated that Plaintiff was moderately to markedly limited in the areas of social interaction and adaptation. (*Id.*) Based on these observations, he stated that Plaintiff was likely to be absent from work more than three times per month. (*Id.*) Although Dr. Piccinini had been treating Plaintiff for over two years, the ALJ only gave his opinion "some weight" because his opinion was not consistent with his own findings and the record as a whole. (TR 36.) The ALJ found that the most notable inconsistency was Dr. Piccinini's belief that Plaintiff could perform low-stress jobs, which he then contradicted by stating that Plaintiff was unable to sustain full-time employment. (*Id.*)

11

Plaintiff contends that the treating specialist's opinion should be controlling and that the ALJ erred in giving only "some weight" to the opinion. (Docket no. 12-2 at 9, 7.) Plaintiff argues that the ALJ rejected Dr. Piccinnini's opinions because of an inconsistency in his records, which was created through a mischaracterization of the record. (*Id* at 7-8.) This mischaracterization allegedly occurred when Dr. Piccinnini indicated that Plaintiff was capable of tolerating low stress, which the ALJ interpreted to mean that Plaintiff could "perform low stress jobs." (*Id* at 8.) Additionally, the Plaintiff argues that the ALJ's rejection of Dr. Piccinnini's opinion was incorrect because the opinion was adequately established through clinical and diagnostic means. (*Id* at 9.) In support of this argument, Plaintiff alleges that the ALJ failed to sufficiently identify the substantial evidence necessary to contradict a treating doctor's opinion. (*Id* at 8.)

Defendant alleges that the ALJ provided sufficient reasoning for giving Dr. Piccinini's opinion little weight. (Docket no. 13 at 14.) In addition to providing sufficient reasoning, the Defendant also argues that the ALJ appropriately analyzed Dr. Piccinini's opinion using the proper regulatory standard. (Docket no. 13 at 15.) Finally, Defendant points out that a treating physician's opinion is given controlling weight when it is well supported by medically acceptable clinical findings and consistent with the record as a whole. (Docket no. 13 at 14-15.) Ultimately, Defendant argues that Dr. Piccinini's evaluation form consists of only opinions that he cannot support through laboratory and diagnostic test results. (Docket no. 13 at 20.) Additionally, these opinions conflict with the record as a whole and activities Plaintiff has engaged in after the onset of her alleged disability. (*Id.*)

Because the ALJ declined to give Dr. Piccinini's opinion controlling weight, he was required to address the Section 404.1527(c)(2). The undersigned finds that he did. First, the ALJ's decision recognized that Dr. Piccinini had been Plaintiff's treating doctor, but she noted that while the record

12

shows that the relationship between Dr. Piccinini and Plaintiff covered approximately two years, the examinations were inconsistent and infrequent. (*Id.*) Second, Plaintiff argues that the treatment Dr. Piccinini provided was focused on addressing her disabling mental impairments (docket no. 12-2 at 10), which the ALJ acknowledged, but he found that the relationship between Dr. Piccinini and Plaintiff consisted primarily of prescribing a consistent medication regiment, which appeared to be beneficial, evidenced by a decrease in the frequency of treatments. (TR 35.) Third, while Plaintiff believes that Dr. Piccinini's opinion provides the sufficient medical findings required to support his opinion (docket no. 12-2 at 10), Dr. Piccinini's opinion does not specifically discuss any of Plaintiff's limitations, and references to his treatment notes do not provide any further explanation for his conclusions. (*Id.*) Fourth, Plaintiff contends that Dr. Piccinini's mental status findings are consistent with the treatment records, but the ALJ noted that there were significant discrepancies between Plaintiff's daily activities, Dr. Piccinini's opinions of her impairments, and the record as a whole. (TR 35-36.) Specifically, the ALJ references that in multiple instances, Plaintiff's testimony was in conflict with the statements that she made in her Function Report, which led to the weight the ALJ gave to Dr. Piccinini's opinion. (TR 33, 36.) Finally, the ALJ properly acknowledged that Dr. Piccinini is a properly licensed and trained psychiatrist.

The undersigned finds that the ALJ appropriately considered relevant factors in her analysis and that she gave good reason for her decision with regard to Dr. Piccinini's opinion. The analysis is sufficiently specific to make clear to the Court and the Plaintiff the weight given to Dr. Piccinini's opinion and the reason for that weight. Therefore, Plaintiff's Motion should be denied with regard to this issue.

### b. Dr. Guyer

Plaintiff also claims the ALJ erred in giving "little weight" to Dr. Guyer's opinion. (Docket

13

no. 12-2 at 7-8.) The Defendant responds that the activities Plaintiff engaged in contradicted statements Dr. Guyer made in his examination report. (Docket no. 13 at 19.)

On January 12, 2012, Dr. Dan Guyer, performed a diagnostic evaluation of Plaintiff after being referred by Dr. Piccinini. (TR 319-20.) Following this evaluation, Dr. Guyer completed a report, which stated that Ms. Morris was "basically immobilized, retreating to bed and unable to function." (TR 320.) Dr. Guyer concluded the evaluation by stating, it was his belief that Plaintiff "is not able to return to any type of gainful employment." (TR 320.) The ALJ gave these opinions "little weight," reasoning that the Doctor's opinion appeared to be based solely on the subjective statements Plaintiff made during their one meeting. (Docket no. 8 at 37.)

The ALJ specifically noted that "Dr. Guyer did not detail any specific findings beyond providing for a global assessment of functioning (GAF) score of 45-50. Actually, he merely documented the claimant's complaints." (TR 35.) The ALJ also noted that a GAF score is only a subjective opinion of a person's perceived ability at a particular time. (*Id.*) The ALJ further noted, despite its numeric appearance, a GAF score is an opinion, not an objective medical finding. (*Id.*) Finally, the ALJ pointed out that the Commissioner has not approved the use of the GAF scale in the disability program, stating that the scale "does not have a direct correlation to the severity requirements in our mental disorders listing." (*Id.*) Because the ALJ is under no obligation to accept a treating physician's conclusory medical opinion, Plaintiff's arguments fail with regard to the ALJ's assessment of Dr. Guyer's report.

### 2. The ALJ's Assessment of Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997). But Credibility

14

assessments are not insulated from judicial review. Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Here, Plaintiff asserts that the ALJ's findings were not sufficient to support the conclusion that Plaintiff's testimony was not credible. (Docket no. 12-2 at 13.) Specifically, Plaintiff alleges that the ALJ erred in finding that: (1) Plaintiff was able to work a full-time job merely because she

had "improved with treatment while free of stress and the other mental demands of employment;" (2) Plaintiff had progressed to a point where she is no longer disabled after two years of medical treatment; (3) Plaintiff's symptoms were controlled because she neglected refilling her prescriptions and decreased the frequency of her doctor visits; and (4) Plaintiff's symptoms were less severe because she had not been hospitalized. (Docket no. 12-2 at 13-14).

Plaintiff first alleges that while she had made modest improvements with treatment, while not exposed to the stress and demands of employment, this does not mean that she can perform a full-time job, working 8 hours a day, 40 hours a week. (Docket no. 12-2 at 13.) Plaintiff argues that there is a significant difference between an individual who has shown improvements due to treatment and someone who is able to maintain a full-time job. (*See* docket no. 12-2 at 13.) Plaintiff believes that her ability to engage in various daily activities does not mean that she can meet the mental or physical demands of full-time employment. (Docket no. 12-2 at 15.) After a thorough discussion of Plaintiff's testimony and medical record, the ALJ determined that Plaintiff's symptoms may not be as bad as she claims. (TR 35-36.) The ALJ specifically noted inconsistencies between Plaintiff's alleged disability and the activities in which she regularly engages. (*Id.*) With regard to these inconsistencies, the ALJ found that "while the symptoms could reasonably be due to her impairments, the daily activities that the claimant continues to engage in reveal that her symptoms are not as severe as she alleges." (TR 36.)

Second, Plaintiff takes issue with the ALJ's determination that after two years of treatment, Plaintiff had progressed to a point where she is no longer disabled. (Docket no. 12-2 at 13.) Specifically, Plaintiff argues that the ALJ's conclusion that Plaintiff stopped treatment with Dr. Piccinini in June 2011 is unsupported. (*Id.*) She points to records as late as September 2011 to indicate that Dr. Piccinini believed Plaintiff's condition had not improved. (*Id.*) But the ALJ found

16

that over two years, the frequency of Plaintiff's treatments with Dr. Piccinini had decreased, and her medication dosages remained consistent. (TR 35) The ALJ also recognized that at Plaintiff's last appointment with Dr. Piccinini, he noted that she was doing well. (*Id.*) Thus, the ALJ determined that the treatment Plaintiff had received was beneficial. (*Id.*)

Third, Plaintiff argues that the ALJ erred in determining that her symptoms were controlled because she neglected to refill her prescriptions and had decreased the frequency of her doctor visits. (Docket no. 12-2 at 13.) Plaintiff contends that because of her mental disabilities, she should not be held responsible for adhering to her medication schedule and for her sporadic medical treatments. (*Id.* at 14.) Nevertheless, the ALJ reasoned that going a week or more without refilling her prescriptions suggests that Plaintiff may not be completely dependent on the medications to help stabilize her mood. (TR 35.)

Finally, Plaintiff argues that the ALJ was incorrect in determining that because she had not been hospitalized as a result of her mental disabilities, her symptoms were less severe. (Docket no. 12-2 at 14.) Specifically, Plaintiff references that neither the Social Security Act nor the Commissioner's Regulations require institutionalization as a prerequisite for making a mental disability determination. (*Id.*) The ALJ does not dispute that Plaintiff has the impairments resulting in her alleged symptoms; however, the ALJ concluded, the alleged intensity of Plaintiff's impairments is inconsistent with the totality of the medical evidence. (TR 35.)

While Plaintiff does point to evidence in support of her assertions, the ALJ provided a detailed analysis to support her conclusions. Thus, even if the Court would decide the matter differently, there is substantial evidence to support the ALJ's determination, and her decision must be affirmed. Therefore, Plaintiff's Motion should be denied with regard to this issue.

17

### 3. The ALJ's Determination of Plaintiff's RFC

Plaintiff argues, in general, that the ALJ's RFC determination was improper, but the ALJ is only required to incorporate in a claimant's RFC (and the hypothetical questions to the VE) those limitations that the ALJ finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Here, the ALJ included in Plaintiff's RFC those limitations that the ALJ found credible. Thus, in substance, Plaintiff's assertion that the RFC is inaccurate is merely a collateral attack on the ALJ's decision not to credit Plaintiff's testimony and her determination with regard to the opinions of Dr. Piccinini and Dr. Guyer, both of which are addressed by Plaintiff's other arguments.

## VI. CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 12) should be DENIED and Defendant's Motion for Summary Judgment (docket no. 13) should be GRANTED.

### REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to

Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: October 7, 2014                s/ Mona K. Majzoub
                                      MONA K. MAJZOUB
                                      UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: October 7, 2014                s/ Lisa C. Bartlett
                                      Case Manager